**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| -----------------------------------------------------------X<br>SOFIA AKBER, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF FIONN IVAR "WINTER" KNUTSON, DECEASED,<br><br>Plaintiff,<br><br>-against-<br><br>CORNELL UNIVERSITY; MADELINE ("MADDIE") JENNINGS; VALEN GREEN; and JOHN AND JANE DOES 1–10,<br><br>Defendants. | **Case No.:** 3:26-cv-2204 (FJS/CBF)<br><br>**COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

Plaintiff Sofia Akber, individually and as Administrator of the Estate of Fionn Ivar "Winter" Knutson, deceased (the "Estate"), by and through her undersigned counsel, Yassi Law PC, brings this Complaint against Defendants Cornell University, Madeline ("Maddie") Jennings, Valen Green, and John and Jane Does 1–10 (collectively, "Defendants"), and alleges, upon personal knowledge as to her own acts and upon information and belief as to all other matters, as follows:

## I. PRELIMINARY STATEMENT

1. This is a civil action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; the Fair Housing Act, 42 U.S.C. § 3601 et seq.; and the statutory and common law of the State of New York, arising from the death by suicide of Fionn Ivar "Winter" Knutson (hereafter "Winter"), a nineteen-year-old Cornell University sophomore, on November 10, 2024.

2. Winter's death was the foreseeable and preventable culmination of a three-month campaign of false accusations, social banishment, and reputational destruction—a campaign conducted inside, and through the instruments of, a residential community that Cornell built, marketed, curated, and promised in writing to **protect.**

3. Winter was non-binary, identified as LGBTQ+, and used they/them pronouns. As an incoming freshman in 2023, Winter applied for and was placed by Cornell into Loving House, Cornell's flagship LGBTQ+ residential program house.

4. Cornell marketed Loving House to students as an intentional community designed "to create an environment that **protects** and **supports** Cornell University's community of LGBTQIA+ students," and as "an **intentional** residential space that is inclusive to all identities to **foster an environment of close-knit support and safety.**"[1]

5. Cornell made these promises in writing, on its public website, in its program-house recruitment materials, and through the formal program-house acknowledgment that every Loving House resident—including Winter—was required to sign. Cornell did not merely promise affirmation; it promised **protection, support, and safety**.

6. Cornell knew exactly whom it was gathering. The published, peer-reviewed medical literature—including research published by Cornell's own Bronfenbrenner Center for Translational Research—establishes that LGBTQ+ college-age students experience significantly elevated rates of serious psychiatric conditions, suicidal ideation, suicide attempts, and self-injury relative to their cisgender heterosexual peers. Cornell also carried its own institutional history: a publicly documented cluster of student suicides in the 2009–2010 academic year that prompted Cornell to install protective netting beneath seven campus-area bridges.

---

[1] https://scl.cornell.edu/residential-life/housing/campus-housing/upper-level-undergraduates/program-houses/loving-house

7. Knowing all of this, Cornell concentrated this population in a single residential community and promised that the community would receive protection, support, and safety. Then Cornell staffed Loving House with generically trained Resident Advisors, embedded no clinical supervision, and permitted the community's de facto town square—the "CornLGBTQ+" Discord server (hereafter "Cornell's Chat" or the "Server"), with which Cornell's own LGBT Resource Center staff engaged—to operate with no monitoring, oversight, or accountability whatsoever.

8. Into these unsupervised spaces stepped Defendant Madeline ("Maddie") Jennings ("Jennings")—a Loving House resident whom Cornell knew to be in an escalating psychiatric crisis—and her roommate, Defendant Valen Green ("Green"). Between September 14 and November 10, 2024, Jennings and Green published, republished, and weaponized successive categories of false accusations against Winter, culminating in a fabricated allegation of sexual assault, using the very platforms, community, and physical spaces Cornell had cultivated.

9. The campaign unfolded in six escalating episodes, each one visible to Cornell: a public false portrayal of Winter as an abuser; the recharacterization of a harmless prank as targeted harassment, reported to and ignored by Cornell's Resident Advisor; Winter's orchestrated banishment from the Server; a door-to-door announcement inside Loving House itself that Winter was "drugging people"; a campaign to destroy Winter's standing in their pledge fraternity, including the initiation or attempted initiation of a student-conduct or Title IX process against Winter on fabricated grounds; and, finally, an accusation of sexual assault, which Jennings amended after Winter's death.

10. When this escalating campaign of false accusations engulfed Winter within that community, no Cornell employee—not the Resident Advisor whom Jennings herself contacted in September, not the crisis counselor whom Jennings visited on multiple occasions during this

period, not the Residence Hall Director, not the LGBT Resource Center Community Fellow embedded in Loving House programming, not the officials on notice of the student-conduct process initiated against Winter—ever investigated, intervened, corrected, or so much as contacted Winter.

11. After Winter's death, Jennings publicly admitted on Cornell's Chat, in her own words, that Winter had "killed themselves because of me." Jennings later amended her account to allege that Winter had orally raped her while she was unconscious—a physically and medically impossible version of events that she has nonetheless disseminated to friends, classmates, hospital staff, the police, and, upon information and belief, members of the press.

12. Cornell's deliberate indifference to known, severe, sex-based harassment of a student within its programs and housing; Cornell's breach of the protective undertaking it made in writing and sold to Winter and Winter's family; and the intentional, tortious conduct of Jennings and Green combined to produce Winter's death. Plaintiff seeks compensatory and punitive damages, attorneys' fees, and equitable relief.

## II. JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because those claims arise under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and the Fair Housing Act, 42 U.S.C. § 3601 et seq. The Fair Housing Act independently confers jurisdiction pursuant to 42 U.S.C. § 3613(a).

14. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant Cornell University resides in this District; because, upon information and belief, Defendants Jennings and Green reside, are domiciled, or attend school in this District; and because a substantial part of the events and omissions giving rise to the claims occurred in this District, on and around the Cornell University campus in Ithaca, Tompkins County, New York.

## III. PARTIES

16. Plaintiff Sofia Akber is a citizen and resident of the State of New York and is the mother of decedent Winter. Plaintiff brings this action in her capacity as the duly appointed Administrator of the Estate: on behalf of the Estate, as to the decedent's claims that survive pursuant to N.Y. EPTL § 11-3.2; and on behalf of Winter's distributees, as to the wrongful death claim under N.Y. EPTL § 5-4.1.

17. Decedent Winter (referred to herein as "Winter" and by the pronouns they/them) was, at the time of their death, a sophomore at Cornell University; a member of the Cornell LGBTQ+ community; a former resident of Loving House, Cornell's LGBTQ+ program house within Mews Hall; a dues-paying "out-of-house" member of Loving House; and a pledge (and later member) of the Kappa Delta Rho ("KDR") fraternity. Winter died by suicide on November 10, 2024.[2]

18. Defendant Cornell University ("Cornell") is a private educational institution organized under the laws of the State of New York with its principal place of business in Ithaca, Tompkins County, New York. Cornell receives federal financial assistance and is subject to Title IX, 20 U.S.C. § 1681 et seq. Cornell is an education corporation chartered by the State of New York that holds itself out to the public to be non-sectarian and is exempt from taxation pursuant to article four of the Real Property Tax Law. Cornell owns, operates, and rents residential dormitories —

[2] Sometime in October 2024, Winter became an official member of the fraternity.

including Mews Hall, in which Loving House is located — that are "dwellings" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b). At all relevant times, Cornell owned, operated, marketed, curated, staffed, and supervised Loving House and the residential community it convened there, and held itself out as providing an environment of protection, support, and safety for the residents and members of Loving House and the broader Cornell LGBTQ+ community.

19. Defendant Jennings is, upon information and belief, a natural person who at all relevant times attended Cornell University and resided in Loving House. Jennings used the handle "psych0naut," among others, on the Server. Jennings is sued in her individual capacity.

20. Defendant Green is, upon information and belief, a natural person who at all relevant times attended Cornell University and resided in Loving House as Jennings's roommate. Upon information and belief, Green is a transgender man who uses he/him pronouns. Green is sued in his individual capacity.

21. Defendants John and Jane Does 1–10 are individuals presently unknown to Plaintiff whose identities will be ascertained in discovery, including without limitation the Cornell Resident Advisor(s) assigned to Loving House and Mews Hall during the 2023–2024 and 2024–2025 academic years; the Residence Hall Director(s) with administrative responsibility for Mews Hall; employees of Cornell's LGBT Resource Center who served as Loving House Community Fellows; employees of Cornell Health/CAPS with responsibility for Loving House programming; and members of Cornell's administration whose acts or omissions contributed to Winter's death.

## IV. FACTUAL ALLEGATIONS

### *A. Winter*

22. Winter was born in 2005 and was raised in New York by their mother and father. Winter excelled academically in high school and was recruited to and admitted by Cornell

University, which they began attending in August 2023. Winter was nineteen years old at the time of their death.

23. Winter identified as non-binary and used they/them pronouns. Winter was a member of the LGBTQ+ community.

24. Winter was drawn to Cornell in substantial part because of Cornell's public self-promotion as one of the most LGBTQ+-friendly universities in the country.[3]

25. Winter was diagnosed with attention-deficit/hyperactivity disorder (ADHD) and was prescribed methylphenidate, which they took as directed.[4]

26. Winter was, by every available measure, a generous and loyal friend who repeatedly served as a caretaker for friends in distress. At the time of their death, Winter was a member of the Cornell physics community, a pledge of the KDR fraternity, and an active participant in the social life of the Loving House community and the Server.

***B. Loving House: Cornell's Written Promise of Protection, Support, and Safety***

27. Loving House is one of Cornell's "program houses"—themed residential communities that Cornell markets to incoming freshmen and other students to entice enrollment.

28. Loving House opened in the fall of 2019 and is located within Mews Hall on Cornell's North Campus.

29. Cornell publicly describes Loving House, in its marketing materials and on its website, in the following terms: Loving House exists "to create an environment that **protects and supports** Cornell University's community of LGBTQIA+ students."[5] It is "an **intentional residential space**

[3] https://news.cornell.edu/stories/2015/08/campus-pride-index-awards-top-25-spot-cornell; see also https://ithacavoice.org/2016/08/ithaca-college-2/
[4] Methylphenidate (brand name Ritalin) is a commonly prescribed stimulant medication used to treat attention-deficit/hyperactivity disorder.
[5] https://scl.cornell.edu/residential-life/housing/campus-housing/upper-level-undergraduates/program-houses/loving-house

that is inclusive to all identities to **foster an environment of close-knit support and safety**."[6] Loving House seeks to "empower residents through thoughtful **community building** to be a part of a space that is unconditionally accepting."[7] These statements were, and are, made by Cornell to prospective and current residents, including Winter and their family, to induce Winter's attendance in 2023.

30. Cornell's internal publications repeat the same commitment: "the purpose of Loving House is to create an environment that **protects** and supports Cornell University's community of LGBTQ+ undergraduates. A residential space, open to all identities, the Loving House provides an unconditionally accepting **community** in a **supportive and safe environment**."[8]

31. Cornell required every Loving House resident, including Winter, to sign a program acknowledgment form confirming the resident's understanding of and support for the "mission and purpose" of Loving House.

32. Cornell designed and marketed the Loving House community to extend beyond the building's walls. Cornell offers "out-of-house" memberships that allow students who do not reside in the dormitory to pay dues, access the building and its events, and participate fully in the community. Cornell's marketing materials feature a student testimonial celebrating that "[a] lot of my fondest first-year memories were made in Loving House, despite not living there, which is a testament to how open the community is."[9]

33. The combination of (a) Cornell's published advertising materials, (b) its internal publications, and (c) the residents' signed acknowledgment of the Loving House mission

---

[6] *Id.*
[7] *Id.*
[8] https://hr.cornell.edu/sites/default/files/2022-12/Cornell-LGBTQ-Resource-Guide-.pdf
[9] https://scl.cornell.edu/news-events/news/loving-house-creates-space-lgbtq-students-explore-identity-and-embrace-community-0

constitutes a voluntary undertaking by Cornell to provide **protection, support, and safety** to the residents and members of the Loving House community.

### *C. What Cornell Knew: The Elevated Risk Profile of the Community It Assembled*

34. Despite this undertaking, Cornell fell well short of actually providing **protection, support, and safety** to the residents and members of the Loving House community.

35. Cornell knew, or in the exercise of reasonable care should have known, that the population it intentionally concentrated in Loving House carries a significantly elevated mental-health risk profile relative to the general student population.

36. Peer-reviewed research shows that LGBTQ+ college-age students have higher rates of borderline personality disorder, bipolar disorder, PTSD, substance use disorder, anxiety, depression, suicidal thoughts, and suicide completion compared to their cisgender heterosexual peers. By way of example:

37. A 2025 study from the National Institutes of Health, encompassing more than 269,000 participants, found that sexual and gender minorities ("SGM") "had significantly higher odds of at least 4 of 10 commonly diagnosed mental health conditions compared with their non-SGM counterparts."[10] The finding "underscore[d] the need for tailored mental health interventions to improve the well-being of SGM populations."[11]

---

[10] https://pmc.ncbi.nlm.nih.gov/articles/PMC11780479/ Men with cisgender sexual minority identity had higher odds of bipolar disorder (adjusted odds ratio [AOR], 1.87; 95% CI, 1.70-2.56) compared with cisgender heterosexual men. Women with cisgender sexual minority identity had higher odds of bipolar disorder (AOR, 2.09; 95% CI, 1.95-2.25) compared with cisgender heterosexual women. Gender diverse people assigned female sex at birth had higher odds of posttraumatic stress disorder (PTSD) compared with both cisgender heterosexual men (AOR, 3.67; 95% CI, 2.99-4.50) and cisgender heterosexual women (AOR, 2.77; 95% CI, 2.26-3.40). Gender diverse individuals assigned male sex at birth had higher odds of bipolar disorder (AOR, 2.35; 95% CI, 1.66-3.33) compared with cisgender heterosexual men and higher odds of attention-deficit/hyperactivity disorder (AOR, 2.19; 95% CI, 1.48-3.23) compared with cisgender heterosexual women. Transgender men had higher odds of depression (AOR, 2.11; 95% CI, 1.80-2.49) compared with cisgender heterosexual men, while transgender women had higher odds of any personality disorder (AOR, 2.71; 95% CI, 1.84-3.99) compared with cisgender heterosexual women.

[11] *Id.*

38. A 2024 peer-reviewed meta-analysis of seven studies found that patients with borderline personality disorder are 3.39 times more likely to have a homosexual or bisexual orientation than members of the general population, with a pooled prevalence of 28 percent.[12]

39. The American Psychiatric Association reports that LGBTQ+ individuals are more than twice as likely as heterosexual individuals to experience a mental health disorder during their lifetime and 2.5 times more likely to experience depression, anxiety, and substance misuse.[13]

40. According to the Trevor Project, LGBTQ+ young people (ages 13–24) are more than **four times as likely** to attempt suicide as their cisgender heterosexual peers.[14]

41. A 2019 study found that non-suicidal self-injury ("NSSI") is also more prevalent among LGBTQ+ individuals.[15]

42. Cornell's own Research Program on Self-Injury and Recovery, housed at Cornell's Bronfenbrenner Center for Translational Research, has published research documenting the consensus that self-injurious behavior occurs at substantially higher rates among LGBTQ+ individuals, including a finding that individuals with a sexual orientation other than heterosexual had a 2.6-times-higher risk of engaging in self-injury.[16]

43. In addition to having constructive knowledge of this published epidemiology, Cornell has specific institutional experience with student suicide. In the 2009–2010 academic year, Cornell

---

[12] https://pmc.ncbi.nlm.nih.gov/articles/PMC11617515/
[13] https://www.psychiatry.org/psychiatrists/diversity/education/lgbtq-patients
[14] https://www.thetrevorproject.org/resources/article/facts-about-lgbtq-youth-suicide/
[15] https://pubmed.ncbi.nlm.nih.gov/31734440/ "NSSI prevalence rates were quite elevated among sexual (29.68% lifetime) and gender (46.65% lifetime) minority individuals compared to heterosexual and/or cisgender peers (14.57% lifetime), with transgender (46.65% lifetime) and bisexual (41.47% lifetime) individuals being at greatest risk. Even among these group findings, sexual minority youth emerged as an especially vulnerable population. Moreover, current evidence suggests these rates and differences between LGBT and heterosexual and/or cisgender peers have not declined over time."
[16] Cornell Research Program on Self-Injury and Recovery, Bronfenbrenner Center for Translational Research, The Relationship Between NSSI and LGBTQ Identities, https://www.selfinjury.bctr.cornell.edu/perch/resources/the-relationship-between-nssi-and-lgbtq-identities.pdf.

suffered a publicly documented cluster of student suicides,[17] which led to the installation of nets under seven bridges on or near campus.[18]

44. Accordingly, when Cornell convened, curated, and marketed the Loving House community, it did so with actual or constructive knowledge that (a) the community's population faced sharply elevated risks of psychiatric illness, self-injury, and suicide; (b) the efficacy of institutional support would be a primary determinant of whether those risks materialized; and (c) Cornell's own campus had lethal experience with the consequences of inadequate mental-health infrastructure.

### *D. The Gap Between the Promise and the Provision*

45. Despite Cornell's knowledge and written undertakings, Cornell's staffing and supervision of Loving House were wholly inadequate.

46. Upon information and belief, Cornell provided its Loving House Resident Advisors no specialized mental-health crisis training tailored to the known risk profile of the Loving House population, and embedded no full-time clinical staff in the community. The Faculty-in-Residence for Mews Hall and Loving House was a senior lecturer in the Department of Romance Studies, with no clinical credentials.[19]

47. The weekly "Let's Talk" drop-in session — an informal coffee chat with a CAPS counselor — was not, and was never represented to be, clinical supervision of the community. It was not a substitute for the supervisory and protective functions Cornell had voluntarily assumed and held out to residents and their families in its Loving House marketing materials.

---

[17] https://www.nytimes.com/2010/03/17/education/17cornell.html
[18] https://ezramagazine.cornell.edu/FALL13/CoverStorySidebar1.html
[19] https://scl.cornell.edu/residential-life/housing/campus-housing/upper-level-undergraduates/program-houses/loving-house

48. The Server functioned as the principal communications platform and de facto town square of the Loving House community. Its membership included Loving House residents and out-of-house members, more than one hundred Cornell students, and moderators affiliated with the community. Upon information and belief, Cornell's LGBT Resource Center staff knew of and engaged with the Server.

49. Cornell imposed no monitoring, oversight, or accountability measures of any kind on the Server, notwithstanding that the Server was the primary medium through which the community Cornell convened communicated, organized, and—as alleged below—conducted a sustained campaign of harassment and bullying against one of its members.

50. Upon information and belief, Cornell's supervision of the physical Loving House community was likewise deficient: underage students drank openly in the Loving House lounge and other shared spaces, and instances of heavy drinking, self-injury, bullying, and harassment within the community went unaddressed by Cornell staff.

51. The result is a residential community that Cornell built on a foundation of promises it did not keep. Cornell undertook to "protect," yet it assigned generic residential staff to a population it knew faced elevated risks of suicide, self-injury, and serious psychiatric illness.

52. Cornell undertook to "support," yet it provided only a weekly "drop-in" coffee chat and a faculty-in-residence with no clinical credentials.

53. Cornell undertook to provide "safety," yet it allowed the principal digital communication channel of the community it created to operate without monitoring, oversight, or accountability.

54. Cornell undertook to deliver a "close-knit" community that extended beyond the walls of Mews Hall, but when that community turned toxic and defamatory for Winter, the institutional apparatus that Cornell promised would be there was absent.

***E. Winter's Reliance and Freshman Year in Loving House***

55. Winter and Winter's family reviewed Cornell's published representations regarding Loving House — including its promises of protection, support, and safety — in deciding where Winter would live. In reliance on those representations, Winter applied to Loving House, was placed there for the 2023–2024 academic year, and signed the required program-house acknowledgment adopting the Loving House mission.

56. Winter's reliance was precisely the reliance Cornell's marketing was designed to induce: the selection of Loving House as a home on the basis of Cornell's represented commitment to protect the students who lived there.

57. Within weeks of arriving at Loving House, Winter formed close friendships within the community. Winter's primary social network throughout freshman year and into sophomore year consisted of Loving House residents and LGBTQ+ Cornell students who participated in the Server and the Loving House community.

58. For the 2024–2025 academic year, Winter moved off the Loving House floor but continued to reside in Cornell student housing in Ganędagǫ Hall, and remained socially anchored to the Loving House community as a dues-paying out-of-house member with continuing access privileges to the building and its events.[20]

***F. Jennings: The Crisis Cornell Watched in Real Time***

[20] Winter paid $30.00 in dues in the fall 2024 semester to be an out-of-house member of Loving House.

59. During their freshman year, Winter developed a close friendship with Jennings, a fellow resident of Loving House.

60. Jennings has a self-reported history of multiple psychiatric diagnoses, including bipolar disorder, schizophrenia, borderline personality disorder, narcissistic personality disorder, histrionic personality disorder, and autism. Jennings claimed to Winter that she had been hospitalized for psychiatric reasons, had self-harmed, and had attempted suicide on numerous prior occasions.

61. Upon information and belief, Jennings was prescribed Abilify (aripiprazole), an antipsychotic medication,[21] which she admitted to Winter she frequently failed to take. Jennings admitted to Winter, in writing, that when she was off her medication, she experienced auditory and tactile hallucinations.

62. Jennings's psychiatric instability was not private. She broadcast it repeatedly and in detail to the Server, Cornell professors, and Cornell's crisis counselors.

63. By way of example, on September 22, 2024, Jennings reported on Cornell's Chat that she was off her antipsychotics.[22]

| | | |
|---|---|---|
| 9/22/2024 17:51:54 | Maddie | this is esp rough since i'm off my antipsychotics |
| 9/22/2024 17:52:09 | Maddie | i need to pick up my meds tmr |
| 9/22/2024 17:52:16 | Maddie | they make me less delusional |

[21] Aripiprazole is generally used to treat schizophrenia, bipolar I disorder, major depressive disorder, autism-related irritability, and Tourette's disorder.
[22] She wrote "this is [especially] rough since I'm off my antipsychotics."

| | | |
|---|---|---|
| 9/22/2024 17:52:28 | Maddie | i started experiencing psychosis when i was off them |
| 9/22/2024 17:52:36 | Maddie | heard voices for the first time |
| 9/22/2024 17:52:38 | Maddie | which kinda sucked |
| 9/22/2024 17:52:46 | Maddie | thought someone was gonna come into my room and kill me |
| 9/22/2024 17:52:58 | Maddie | yeah, i had an emergency meds appt |

64. On September 25, 2024, Jennings wrote to the Server that she was "very mentally ill," that she had been skipping classes because she was off her medication and depressed, and that she was "heavily dependent" on her medication.

| | | |
|---|---|---|
| 9/25/2024 1:53:20 | Maddie | i was skipping my classes because i was off my meds and depressed |
| 9/25/2024 1:53:29 | Maddie | i am like |
| 9/25/2024 1:53:33 | Maddie | heavily dependent on them |
| 9/25/2024 1:53:45 | Maddie | i was also avoiding a certain individual in my classes that i do not want to encounter |
| 9/25/2024 1:54:27 | Maddie | yeah |
| 9/25/2024 1:54:28 | Maddie | look, |
| 9/25/2024 1:54:32 | Maddie | i'm very mentally ill |

65. Jennings also abused alcohol and drugs. On one occasion, she offered Winter LSD, which they declined. On or about April 20, 2024, she reported to Winter that she had consumed 10 to 12 drinks and smoked marijuana without blacking out, "remember[ing] everything." On or about May 17, 2024, she told Winter she could feign sobriety until 15 drinks in. These admissions bear directly on the plausibility of her later rape claim, described below, because she claimed she "blacked out" after consuming approximately one and one-half **cups** of wine.

66. Cornell was aware of Jennings's struggles. On or about October 24, 2024, Jennings was hospitalized for the consumption of alcohol and prescription drugs. Upon information and belief, her hospitalization was reported to the school.

67. Jennings also exhibited a documented pattern of public accusations against others and threats of self-harm, of which Cornell was aware.

68. After a breakup during her freshman year, she publicly labeled her former partner (not Winter) a stalker.

69. On September 2, 2024, in Cornell's Chat, Jennings stated that she wanted to "rope"[23] because someone was "sextorting"[24] her by telling her father about an incident in which she "pegged . . . someone in [the Cornell Chat] server . . . in a dress at a park. . ."[25] She also stated that she was "going to the police tomorrow" and that the person who was sextorting her had "threatened

[23] Upon information and belief, wanting to "rope" in this context means wanting to hang oneself or commit suicide.
[24] Sextortion is a form of online blackmail in which someone threatens to distribute another person's private, explicit images or videos unless that person meets the blackmailer's demands.
[25] Pegging is a sexual practice where a person, traditionally a woman, uses a strap-on dildo to penetrate the anus of a partner, most commonly a man.

to rape [her]" and "have [her] swatted." She later stated that the "doxxer"[26] claimed to be an ex of hers, and then that her "groomer"[27] was behind the incident.[28]

70. On September 14, 2024, she wrote on Cornell's Chat that, while she was in the lounge, a random cis[29] guy approached and sat down next to her, which she said made her uncomfortable.

71. On September 16, 2024, she wrote on Cornell's Chat, labeling an unidentified male a "racist" who had "done some nasty in the anime club," and later said that she was going to get him banned from the club.

72. Throughout the spring and summer of 2024, Jennings's text and Discord messages to Winter and the Server contained extensive, casual, and normalized references to suicide (including the phrase "I'm gonna rope") and to self-cutting. Jennings repeatedly threatened suicide to Winter as a means of preventing Winter from withdrawing from the friendship.

73. On numerous occasions during Winter's freshman year and after, Jennings called on Winter to serve as her crisis-response caregiver. Upon information and belief, Cornell knew or should have known that a teenage student was performing crisis-response functions for a psychiatrically unstable resident — functions that Cornell's professional staff should have been performing — and did nothing to relieve Winter of that role.

74. Cornell's knowledge of Jennings's condition was direct, repeated, and institutional: as alleged below, by late September 2024 the police had performed at least one welfare check on Jennings; her professors had emailed her expressing concern; she was seeing a crisis counselor who, upon information and belief, was a Cornell employee or was provided through a Cornell

---

[26] A doxxer is an individual who maliciously searches for, collects, and publicly releases an individual's or organization's private, personally identifiable information (PII) online without consent.
[27] A "groomer" is a person who builds a deceptive, trusting relationship with a child, teenager, or vulnerable adult to manipulate, exploit, or sexually abuse them.
[28] On the same day, she called her own father "my homophobic fucking father."
[29] "Cis" (cisgender) describes a person whose gender identity corresponds to the sex assigned at birth.

program; and she was twice hospitalized in late October 2024, with, upon information and belief, her hospitalizations reported to Cornell.

***G. Valen Green***

75. Defendant Green was Jennings's roommate in Loving House during the 2024–2025 academic year. Upon information and belief, Green self-identifies as suffering from depression.

76. Green and Winter shared a freshman-year lab but developed a social connection only in sophomore year, after Green became Jennings's roommate. Even then, they were friends by association, and that friendship soured quickly.

77. After Winter and Jennings began having problems in their sophomore year, Green became Jennings's de facto enforcer.

***H. Winter and Jennings: Freshman Year Through Early September 2024***

78. Over the course of their freshman year, Winter's friendship with Jennings developed into a romantic interest on Winter's part. The relationship turned toxic during Winter's sophomore year.

79. On or about March 10, 2024, Winter expressed their romantic interest to Jennings. Jennings did not initially reciprocate but used that admission to manipulate and lead Winter on.

80. On or about May 10, 2024, Jennings visited Winter's family home and had dinner with the family.

81. In late May 2024, after the students had left for summer break, Jennings messaged Winter and expressed hope for a future relationship. Winter also expressed excitement about the prospect of a romantic relationship.

82. Jennings planned a visit to Winter at their family home in June but canceled the day before, citing her mother as the reason. She later told Winter that she would be stuck in Boston

all summer due to family issues and stopped all communications with Winter from June 19 to July 2, 2024.

83. In late July, Winter and Jennings discussed the prospect of a future romantic relationship, but Jennings informed Winter that it would be a long time before she would be ready for one. Winter expressed disappointment, and the two stopped talking for a few weeks.

84. On or about August 18, 2024, the two began speaking again. Winter expressed their disappointment and said that they felt manipulated, led on, and used.

85. Despite this candid conversation, the two worked through their differences and began the semester as friends.

86. Winter and Jennings remained friends until early September 2024, when Winter discovered that Jennings had been romantically involved with another man during the summer recess.

***I. The Campaign: September 14 – November 10, 2024***

***Episode One — The Inversion (September 14, 2024)***

87. On September 14, 2024, Winter confronted Jennings via text message about Jennings's prior emotional abuse—including her months-long pattern of holding out the prospect of a romantic relationship with Winter while simultaneously being involved with another man ("Liam"). Winter then requested space from Jennings to get over the situation.

88. Within hours of that private conversation, Jennings began publishing false statements about Winter to the Server—a community that included Winter, Loving House residents and out-of-house members, Cornell staff, and Cornell-affiliated moderators, including "Alice" (Green's girlfriend).

89. Jennings's September 14 publications falsely portrayed Winter as the perpetrator of the emotional abuse that Jennings had in fact directed at Winter. Upon information and belief, Green echoed and republished Jennings's statements in the Server.

90. The falsity of the September 14 portrayal is established by Jennings's own subsequent written admissions, including her October 17, 2024 statement to the Server — "Recently I had an episode where I couldn't get my meds for a while (doctor f***ed up and didn't prescribe refills) and I tweaked out and lost most of my friends . . . I understand why my friends cut me off" — and her late-October written apology to Winter acknowledging that she had led Winter on.

***Episode Two — The Door Incident and the First Report to Cornell (September 16, 2024)***

91. On September 16, 2024, Winter and a mutual friend jokingly rigged a Loving House lounge door to be slightly harder to open. The prank was directed at another friend, Primrose, as good-natured retaliation for Primrose's tardiness to a planned movie night.

92. Jennings, who encountered the door before the prank was undone, publicly recharacterized it on the Server as an act of harassment directed at her personally.

93. Specifically, she wrote on Cornell's Chat:

| | | |
|---|---|---|
| 9/16/2024 23:00:57 | Maddie | Omfg the friend I cut off is acting like a literal child. I was just walking to my dorm to go to bed and they were in the lounge right next to my dorm and they decided to put a fuckin chair over the door? Like???? |
| 9/16/2024 23:01:31 | Maddie | This is literally my living space and you don't even live here tf?????? |

| | | |
|---|---|---|
| 9/16/2024 23:01:33 | Maddie | 😭😭😭 |
| 9/16/2024 23:02:01 | Maddie | I wasn't even gonna go in there |
| 9/16/2024 23:02:09 | Maddie | I was just going to bed |
| 9/16/2024 23:02:43 | Maddie | This is the one who said they wish I flunked out btw |
| 9/16/2024 23:03:11 | Maddie | I'm just tryna exist in peace 😭😭😭 |
| 9/16/2024 23:03:39 | Maddie | I also lost like several friends over this |
| 9/16/2024 23:04:03 | Maddie | THIS WAS IN LOVING |
| 9/16/2024 23:04:26 | Maddie | They don't even live here |
| 9/16/2024 23:04:32 | Maddie | I might go to the RA |
| 9/16/2024 23:05:25 | Maddie | Tbh they've done a good job convincing people I'm some psycho that led them on |
| 9/16/2024 23:05:37 | Maddie | I don't blame the ppl who cut me off |

| | | |
|---|---|---|
| 9/16/2024 23:05:45 | Maddie | They had limited information |
| 9/16/2024 23:12:39 | Maddie | Called the RA |

| | | |
|---|---|---|
| 9/16/2024 23:16:38 | Maddie | This ordeal sucks so badly |
| 9/16/2024 23:16:55 | Maddie | I don't even know who all hates me atp |
| 9/16/2024 23:17:07 | Maddie | I get dirty looks from people all the time here now |
| 9/16/2024 23:17:24 | Maddie | I'm half tempted to just set the record straight with each and every one of them |
| 9/16/2024 23:18:46 | Maddie | RA isn't even doing anything |
| 9/16/2024 23:18:48 | Maddie | Fml |

94. Jennings's own contemporaneous messages establish that, no later than September 16, 2024, Cornell's Resident Advisor staff had actual knowledge of the escalating conflict between Jennings and Winter inside Loving House — and, in Jennings's words, "isn't even doing anything."

95. Winter sent Jennings and Green a brief private message explaining that the door rig was not directed at her. Jennings did not respond and did not at any time correct her public misstatements on Cornell's Chat.

96. On September 22, 2024, Jennings wrote on Cornell's Chat that she "got the cops called on [her] the other night" and had to tell them she was okay. She also reported that some of her professors had emailed her to express concern for her well-being. **She then suggested to the chat that she might have to take a health leave**. Upon information and belief, Cornell was aware that Jennings was considering this option.

| | | |
|---|---|---|
| 9/22/2024 17:25:10 | Maddie | i got the cops called on me the other night |
| 9/22/2024 17:25:14 | Maddie | and i had to tell them i was okay |
| 9/22/2024 17:25:41 | Maddie | even my professors have emailed me concerned about me |
| 9/22/2024 17:25:49 | Maddie | i might honestly have to take a health leave |

97. These messages further indicate that, on or before September 22, 2024, Cornell knew that emergency responders had been called to check on Jennings and that Cornell faculty had expressed concern about her well-being.

***Episode Three — The Banishment (September 25, 2024)***

98. On September 25, 2024, Jennings wrote to the Server that she might have to take a health leave but did not want to, because doing so would "prove the person who told me I wouldn't

make it" right. The person referenced was Winter. In the same exchange, Jennings disclosed that she was "very suicidal," that she had seen a crisis counselor and that she "could definitely use intensive care and rehabilitation."

| | | |
|---|---|---|
| 9/25/2024 15:06:45 | Maddie | atp i might just have to take a health leave, but i don't want to, bc then i'll prove the person who told me i wouldn't make it right |
| 9/25/2024 15:07:35 | Maddie | i was seeing a crisis counselor here and i'm in therapy, but it doesn't even rly help that much |
| 9/25/2024 15:07:41 | Maddie | it makes me feel better in the moment |

| | | |
|---|---|---|
| 9/25/2024 15:14:39 | Maddie | trigger warning |
| 9/25/2024 15:14:52 | Maddie | \|\|i am very suicidal right now, and the only thing stopping me is my bf\|\| |
| 9/25/2024 15:15:05 | Maddie | i saw a crisis counselor abt it |
| 9/25/2024 15:15:12 | Maddie | but it's still there |
| 9/25/2024 15:15:38 | Maddie | when i pulled an all nighter the other night i almost caved and did it |
| 9/25/2024 15:15:40 | Maddie | but yeah |

| | | |
|---|---|---|
| 9/25/2024 15:15:43 | Maddie | my bf helped |
| 9/25/2024 15:15:59 | Maddie | i considered going to the hospital |
| 9/25/2024 15:16:05 | Maddie | but the ithaca psych ward is pretty bad i heard |
| 9/25/2024 15:16:26 | Maddie | and like |
| 9/25/2024 15:16:30 | Maddie | when i went to the psych ward before |
| 9/25/2024 15:16:33 | Maddie | it was really traumatic |
| 9/25/2024 15:36:06 | Maddie | yeah, tbh i wouldn't say this is an emergency, but i could definitely use intensive care and rehabilitation |
| 9/25/2024 15:36:34 | Maddie | i've done a few IOPs and they didn't rly help |
| 9/25/2024 15:36:38 | Maddie | i got kicked out of my last one LOL |
| 9/25/2024 15:42:09 | Maddie | yeah, i've been involuntarily committed before |
| 9/25/2024 15:42:11 | Maddie | it ain't fun |

| | | |
|---|---|---|
| 9/25/2024 15:42:28 | Maddie | that's part of why i am afraid to share the extent of these thoughts with anyone |
| 9/25/2024 15:42:36 | Maddie | i already got the cops called on me this week |

99. Later that day, Jennings again wrote on Cornell's Chat about her struggles in school, saying she was "especially pissed" about her academic situation because the person she "hates the most"[30] in the world told her she would flunk out that semester, and she didn't want to prove them right. She said she was not going to let them win and couldn't miss any more classes, even if she had to see Winter there.

100. In response, Winter spoke up, defending themself against Jennings's and Green's coordinated defamatory attack, to which Jennings responded: "I do not feel comfortable around this person **for reasons that have not been stated here**."

| | | |
|---|---|---|
| 9/25/2024 15:54:45 | Maddie | i am just especially pissed |
| 9/25/2024 15:54:58 | Maddie | because the person i hate the most in this world told me i would flunk out this semester |
| 9/25/2024 15:55:04 | Maddie | and i really do not want to prove them right |
| 9/25/2024 15:58:32 | Maddie | fuck it, i'm not gonna let them win |

[30] Referring to Winter.

| | | |
|---|---|---|
| 9/25/2024 15:58:36 | Maddie | i can't miss any more classes |
| 9/25/2024 15:58:42 | Maddie | even if i have to see them there |
| 9/25/2024 18:08:57 | Maddie | valen is my roommate. he knows a lot about this situation and i would not say he is blindly taking sides. |
| 9/25/2024 18:09:17 | Maddie | i literally didn't even mention you. |
| 9/25/2024 18:10:09 | Maddie | i do not feel comfortable around this person for reasons that have not been stated here. i am just going to do my work. |

101. Upon information and belief, after Winter spoke up, Green contacted his girlfriend, Alice, a moderator of the Server, and told her that in February 2024 (during Winter's freshman year), Jennings had witnessed Winter attempt to cut themself while severely intoxicated.

102. Upon information and belief, Green reported to the moderators (1) that Winter was pressuring Jennings to transition, and (2) that "winter cut themself in front of me."

103. On the basis of that out-of-server disclosure of Winter's private mental-health history, the moderators banned Winter from the Server.[31]

104. The banishment caused immediate and severe reputational harm and social isolation. The community Winter had worked to become part of since freshman year—the

[31] When Winter sought an explanation for the ban, Server moderator Emma acknowledged that the ban was based on out-of-server information that she stated she was not permitted to share.

community Cornell convened, marketed, and promised to make safe—was taken from Winter with the click of a button.

105. Winter spent the ensuing four weeks petitioning for readmission to the Server.

106. The ban was orchestrated by Jennings and Green within a Cornell-affiliated, school-endorsed communications channel; Cornell's LGBT Resource Center and/or Loving House staff knew or should have known of the events surrounding the ban.

107. On October 5, 2024, Jennings wrote on Cornell's Chat that her friend group had kicked her out.

108. On October 17, 2024, she wrote on Cornell's Chat that she missed having friends and that she had recently had an episode in which she couldn't get her meds for a while and "**tweaked out and lost most of [her] friends.**"

109. She also stated that she understood why her friends had cut her off and that she had considered reaching out to her old friends to let them know she was better. Upon information and belief, Winter was one of the friends she was referencing.

| | | |
|---|---|---|
| 10/5/2024 22:13:25 | Maddie | my stupid fucking friend group kicked me out |
| 10/5/2024 22:13:28 | Maddie | great |
| 10/5/2024 22:13:33 | Maddie | now i literally have nobody |
| 10/5/2024 22:14:04 | Maddie | i just |
| 10/5/2024 22:14:13 | Maddie | wish people had more empathy |
| 10/5/2024 22:14:27 | Maddie | i cant do this anymore |
| 10/5/2024 22:14:30 | Maddie | i just cant |

| | | |
|---|---|---|
| 10/17/2024 15:35:33 | Maddie | I miss having friends. |

| | | |
|---|---|---|
| 10/17/2024 15:36:08 | Maddie | Recently I had an episode where I couldn't get my meds for a while (doctor fucked up and didn't prescribe refills) and I tweaked out and lost most of my friends. |
| 10/17/2024 15:36:12 | Maddie | And it's really lonely. |
| 10/17/2024 15:36:37 | Maddie | I'm trying to make new friends, but it's rough, man. |
| 10/17/2024 15:37:14 | Maddie | The only people I've even spoken to this month are my roommate and my bf. |
| 10/17/2024 15:37:58 | Maddie | Like, I understand why my friends cut me off, but it stillreallysucks. |
| 10/17/2024 15:39:16 | Maddie | Ofc. |
| 10/17/2024 15:39:55 | Maddie | Yeah. |
| 10/17/2024 15:40:07 | Maddie | I considered reaching out to my old friends and letting them know that I'm better now, |
| 10/17/2024 15:40:14 | Maddie | But atp I don't think it'll do much. |
| 10/17/2024 15:41:19 | Maddie | Yeah, it'll probably be a few months before they're willing to talk to me again. |

110. These statements are further evidence that Jennings's defamatory statements were false and malicious when made.

***<u>Episode Four — The "Mystery Pill" and the Door-to-Door Campaign (October 23–24, 2024)</u>***

111. Upon information and belief, late on October 23, 2024, Jennings asked Winter to meet in person to resolve their differences. When Winter arrived at Jennings's Loving House room, Jennings was attempting to cut herself with a box cutter. Winter took the box cutter away from her to prevent her from harming herself.

112. Months prior to the events of October 23–24, Jennings had taken one of Winter's 5-milligram methylphenidate (ADHD) tablets, with no adverse effect.[32]

113. Upon information and belief, Jennings had recently broken up with her long-distance boyfriend, Liam, whom she had on previous occasions described as an abuser.

114. Upon information and belief, the real reason Jennings asked Winter to hang out on the night of October 23, 2024, was either to obtain Ritalin for her ongoing academic struggles or to cope with her recent breakup with her ex-boyfriend.[33]

115. On the night of October 23 into October 24, 2024, Jennings ingested, upon information and belief, 5 milligrams of methylphenidate together with the antihistamine hydroxyzine, an antipsychotic medication, hard alcohol, and four to five energy drinks. In the early morning of October 24, she went to the hospital.

116. Before her hospitalization, Jennings described her own conduct to the Server—and then, within minutes, recast it as Winter's:

| | | |
|---|---|---|
| 10/24/2024 4:44:45 | Maddie | at what point should i go to the hospital |
| 10/24/2024 4:44:48 | Maddie | for like |
| 10/24/2024 4:44:51 | Maddie | substance related |
| 10/24/2024 4:44:57 | Maddie | difficulty |

[32] https://psych.wisc.edu/news/easy-access-pressure-on-students-contributes-to-increase-in-non-prescribed-adderall-use/ "Studies show 5 to 35 percent of college students have tried Adderall without a prescription."
[33] On October 10, 2024, she wrote on Cornell's Chat that she had failed her "Complex Analysis" midterm, which represented 30% of her grade.

| | | |
|---|---|---|
| 10/24/2024 4:45:12 | Maddie | i can't really feel my heartrate |
| 10/24/2024 4:45:16 | Maddie | and i started sobbing |
| 10/24/2024 4:45:34 | Maddie | i have an exam tomorrow |
| 10/24/2024 4:45:37 | Maddie | i'm scared |
| 10/24/2024 4:45:50 | Maddie | i think i'd be fine health wise |
| 10/24/2024 4:45:55 | Maddie | but i'm gonna fail the exam |
| 10/24/2024 4:46:16 | Maddie | ER |
| 10/24/2024 4:46:23 | Maddie | i'm having bad thoughts |
| 10/24/2024 4:46:34 | Maddie | and i mixed a couple things |
| 10/24/2024 4:46:55 | Maddie | alcohol, mystery adhd pill my friend gave me, antipsychotics, and like maybe 4-5 energy drinks |

| | | |
|---|---|---|
| 10/24/2024 4:57:11 | Maddie | what the fuck |
| 10/24/2024 4:57:21 | Maddie | i had like 5 different things |
| 10/24/2024 4:57:25 | Maddie | yeah will |
| 10/24/2024 4:57:32 | Maddie | my friends are with me |
| 10/24/2024 4:57:37 | Maddie | they'll probably never talk to me again |
| 10/24/2024 4:57:56 | Maddie | aghhhhhh |
| 10/24/2024 4:58:03 | Maddie | one of my former friends gave me the drugs |
| 10/24/2024 4:59:06 | Maddie | do you think i'd die if i fell asleep |
| 10/24/2024 4:59:13 | Maddie | i might just nap it off |
| 10/24/2024 4:59:18 | Maddie | i'm scared of hospitals |

| | | |
|---|---|---|
| 10/24/2024 4:59:19 | Maddie | idk |
| 10/24/2024 4:59:30 | Maddie | last time i ODed they drew like 4 vials of blood |

117. The "former friend" Jennings identified as having given her "the drugs" was Winter. The characterization was false: the single 5-milligram prescription ADHD tablet—the same medication Jennings had taken months earlier without incident—was neither a "mystery" pill nor the cause of her October 24 hospitalization, which resulted from her own combination of antipsychotic medication, antihistamine, hard alcohol, and energy drinks.

118. Three days later, Jennings sent Winter a photograph of a pill bottle, vodka, energy drinks, coffee, and a box cutter arranged on her desk.

119. Because Winter had been banned from the Server, Winter could not respond to these statements. Meanwhile, Jennings and Winter were in direct communication throughout October 24, and Winter believed the two were back on good terms.

120. Before her hospitalization, while the two were communicating on the night of October 23 into the early morning of October 24, Winter asked Jennings for help getting unbanned from Cornell's Chat. Jennings told Winter that she had nothing to do with the ban and that Green had taken it upon himself to get Winter banned from the Server.

121. Upon information and belief, after being released from the hospital, Jennings told Green that she had gone to the hospital because of the "drugs" Winter had given her.

122. Green then walked through Loving House, knocking on the doors of residents and announcing, in substance, that Winter was drugging people, that Winter had threatened violence against him and Jennings, and that residents should be careful around Winter.

123. Green's door-to-door announcements were defamatory, imputed a serious crime to Winter, and were made inside residential premises owned, operated, and staffed by Cornell.

124. The Loving House Resident Advisor(s), the Residence Hall Director, and the LGBT Resource Center Community Fellow(s) knew or should have known of this conduct. None investigated, corrected, or remediated it.

125. The campaign's effect on Winter's relationship to the community was immediate: when Winter and Jennings thereafter agreed to speak in person, Winter asked that Jennings come to Winter's dorm because Winter "didn't want to go to Loving for the time being." Winter—a dues-paying member of the community Cornell promised to make safe—no longer felt able to enter the building.

***Episode Five — The Fraternity Campaign and the Weaponized Conduct Process (Late October 2024)***

126. Isolated from the Loving House community, Winter sought a new one: during the fall 2024 semester, Winter pledged the Kappa Delta Rho fraternity.

127. Upon information and belief, Jennings falsely represented to Green that Winter had threatened physical violence against her and Green, and provided Green with screenshots purporting to show such threats. Upon information and belief, those screenshots were fabricated, or were messages sent to Jennings by Liam—who had previously sent Jennings threatening messages, including instructions to kill herself—misattributed to Winter.

128. Acting on Jennings's statements and the fabricated or misattributed screenshots, Green contacted members of KDR and reported that Winter was a physical threat to Green and Jennings. Upon information and belief, Green also shared the fabricated screenshots with members

of KDR. Green's communications were calculated to jeopardize Winter's standing as a pledge and Winter's prospective initiation into the fraternity.

129. Upon information and belief, Green also presented these allegations to Cornell itself—at a minimum, by initiating or attempting to initiate a Title IX or other student-conduct process against Winter and by seeking a no-contact order against Winter. Each such communication placed Cornell's administration, including officials with authority to investigate and take corrective action, on direct notice of the campaign against Winter.

130. On or about October 26, 2024, Winter and Jennings reconciled. In written communications, Jennings acknowledged that she had led Winter on and apologized for hurting them.

131. In those messages, Jennings also vented about problems she was having with Liam, her on-again, off-again boyfriend.[34]

132. She also confided in Winter about her mental-health struggles, reporting that she was experiencing psychotic episodes and that her doctor had prescribed a lower dosage than she needed. She admitted she was taking her medication sparingly and only as needed instead of following the prescribed dosage, stating, "Cornell Health is terrible about giving people their meds when they're dependent on them."

133. On October 28, 2024, she also told Winter that she was struggling in school and was considering taking a health leave because she thought she might "flunk" out. She also mentioned that she had scheduled another crisis appointment and that the crisis counselor would get her an extension on her schoolwork.[35]

---

[34] Upon information and belief, Jennings apologized only because her social and academic life was deteriorating.
[35] Upon information and belief, the crisis appointment occurred on October 28, 2024.

134. Upon information and belief, Jennings was hospitalized again on October 29, 2024, and Cornell was or should have been aware of that hospitalization. Upon information and belief, on or about November 2, 2024, a Cornell crisis representative referred Jennings to a clinician at Cornell Health; the appointment was missed; and Jennings did not receive a refill of her antipsychotic medication. Upon information and belief, Jennings received an academic-concern email from Cornell on or about November 4, 2024.

135. Throughout this period, Winter repeatedly urged Jennings to take her antipsychotic medication as prescribed and to obtain the help she needed, and repeatedly pleaded with Jennings to correct the record with Green, whose campaign against Winter was escalating. Jennings did not do so.

136. On or about November 2, 2024, Winter and Jennings began a romantic relationship. On November 4, 2024, the day before Winter's birthday, Jennings told Winter she needed space; Winter responded with understanding. Upon information and belief, Jennings then blocked Winter on all communication channels until November 9, 2024—the weekend Winter was celebrating their birthday.

***<u>Episode Six — The Fabricated Accusation (November 9–10, 2024)</u>***

137. On November 9, 2024, it was Jennings who initiated the encounter. At approximately 12:30 a.m. on Saturday, November 9, 2024, Jennings unblocked Winter on her phone and, of her own volition, reached out to Winter to initiate contact. That evening, Jennings (by her own choice and accompanied by a mutual friend, Emily) arrived at Winter's dorm room. The three spent the evening together, first in Winter's dorm room and later at Winter's family home, approximately a five-minute walk from the dorms. Plaintiff Akbar was traveling and was

not present at any point. While in the dorm, the three consumed modest quantities of wine—approximately one and one-half cups each—followed by a late-night meal.

138. At approximately 3:15 a.m. on November 10, Emily prepared to return to the dormitories. Jennings stated she was too cold or too tired to make the five-minute walk back and asked to stay the night. Winter agreed, offered Jennings the bedroom of Winter's sibling, and walked Emily back to the dorms.

139. While Winter was walking Emily home, Jennings sent Winter a series of text messages expressing regret about "ruining everything" between them and asking Winter not to disclose the romantic dimension of their relationship to Emily. Jennings's contemporaneous messages establish that she was conscious, oriented, lucid, and concerned with managing social perception.

140. Upon Winter's return, Jennings left Winter's sibling's bedroom and entered Winter's bedroom, where the two engaged in consensual sexual activities and then fell asleep. Winter contemporaneously described these events in writing to a friend as "wholesome."

141. At approximately 6:45 a.m. on November 10, 2024, within approximately three hours and fifteen minutes of Jennings's last text messages to Winter, Jennings was back in the dorms and telephoned Winter. Winter was alert and engaged in a normal conversation with Winter's friend Michelle approximately 15 to 30 minutes later. Jennings did not, at this time or at any time prior, indicate to Winter that anything non-consensual had occurred.

142. Later that same afternoon, Jennings telephoned Winter again, this time with Defendant Green present. Jennings accused Winter of sexual assault.

143. Jennings presented the accusation in a manner that made plain to Winter that Cornell, KDR, and the entire Server community—the community that had already banned Winter on the strength of Jennings's and Green's prior accusations—would credit her account over Winter's.

144. The psychological coercion was total. Within hours, Winter—whose own contemporaneous writings described the night as consensual and "wholesome"—drafted a written statement adopting Jennings's narrative.

145. That a teenager could be driven, in a single afternoon, to confess in writing to a crime contradicted by their own contemporaneous account, by their accuser's contemporaneous messages, and by the physical timeline, is itself the measure of the coercive power of the campaign — and of the community judgment — that Jennings and Green had constructed and that Cornell had allowed to metastasize unsupervised.

146. Winter then wrote a suicide note centered on the destruction of their reputation, life, and future.

147. On November 10, 2024, Winter died by suicide.

***J. After Winter's Death: The Admissions and the Amended Accusation***

148. Following Winter's death, Jennings published on Cornell's Chat an amended account of the November 9 evening, in which she alleged that there had never been a romantic relationship between her and Winter and that Winter had orally raped her while she was unconscious during an approximately three-hour-and-fifteen-minute window that began more than two hours after she had consumed approximately one and one-half cups of wine.

149. The "unconscious oral rape" version of Jennings's account is medically and physically implausible on its face. It is contradicted by Jennings's contemporaneous text messages

during the alleged window of unconsciousness; by Winter's contemporaneous descriptions of the night; and, upon information and belief, by medical records to be obtained during this litigation.

150. It is also contradicted by her statement to Detective Schweiger of the Ithaca Police Department, who informed Winter's mother, a few days after Winter's death, that Jennings had told him that she had consented to "some things."

151. Jennings disseminated her false accusations on Cornell's Chat, the Cornell subreddit, and the Cornell SideChat, and to her hospital providers, law enforcement, The Cornell Daily Sun, and mutual friends within the Loving House community.[36]

152. In subsequent months, Jennings made further statements to the Server bearing on the falsity of her accusations and the true dynamics of the period, including: that she remained involved with Liam, whom she described as sending her death threats and telling her she deserved to die; that she "lost many friends because of [what her] boyfriend made [her] do — [o]ne of them is dead and the rest want absolutely nothing to do with me"; that she was "on and off" with Liam at the time of Winter's death; and that Liam had repeatedly demanded that she cut Winter off.

153. Upon information and belief, after he and Jennings separated, Liam told Jennings's friends that Jennings had lied about being raped.

154. Liam has also contacted Winter's family directly, stating, "I do not believe that Winter assaulted [Jennings]."

155. Aafter their breakup, Jennings also instructed and encouraged Liam to commit suicide.

156. Jennings was failing multiple courses and was already contemplating a leave of absence in order to avoid the academic consequences of her failing grades; she thereafter seized

[36] When The Cornell Daily Sun reporter assigned to the story asked Jennings for documentary support of her accusations, Jennings called the reporter "a scumbag" and asked that the article be pulled.

upon a fabricated allegation of sexual assault against Winter as a pretext for her leave, so that her withdrawal would be attributed to purported trauma rather than her own academic failures, and so that no negative reason for the leave would appear in her record.

***K. Cornell's Knowledge and Institutional Silence***

157. Cornell's actual knowledge ran through multiple institutional channels: (a) the Loving House Resident Advisor whom Jennings contacted on September 16, 2024, and whose inaction Jennings documented in real time ("RA isn't even doing anything"); (b) the police welfare check on Jennings and the professors who emailed her with documented concern on or before September 22, 2024; (c) the Cornell crisis counselor(s) who treated Jennings beginning no later than September 25, 2024, and the Cornell Health clinicians involved in her care, referrals, and medication management through early November; (d) Jennings's hospitalizations on October 24 and October 29, 2024, which upon information and belief were reported to Cornell; (e) the door-to-door defamation conducted inside Cornell's own residence on October 24, 2024, in the presence of the residential community Cornell staffed; (f) the Cornell-affiliated moderators of the Server who effectuated Winter's banishment on the basis of Winter's private mental-health history; and (g) the Title IX or student-conduct process and no-contact order that Green initiated or attempted to initiate against Winter, which placed Cornell officials with authority to investigate and take corrective action on direct, formal notice.

158. At all relevant times, Cornell maintained Policy 6.4, which prohibits discrimination and harassment based on, inter alia, sexual orientation and gender expression and/or identity, and Cornell publicly represents that it is "committed to providing a safe, inclusive, and respectful learning, living, and working environment" for its students.

159. Despite its knowledge, Cornell undertook no investigation, no remediation, no protective contact with Winter, no protective contact with Plaintiff, and no enforcement of Policy 6.4 or its anti-bullying and anti-harassment policies with respect to the campaign against Winter.

160. Cornell's silence toward Winter was not the product of institutional incapacity. Throughout the same period, Cornell's apparatus responded repeatedly to Jennings: welfare checks, professor outreach, crisis counseling, clinical referrals, academic extensions, and academic-concern correspondence. Cornell possessed the personnel, the information, and the authority to act. As to Winter — the target of the campaign — Cornell chose to do nothing.

161. As a direct and foreseeable result of the conduct alleged above, Winter was, by early November 2024: banished from the principal LGBTQ+ community on campus; afraid to enter the Loving House building; under active reputational attack within their pledge fraternity; the subject of a student-conduct or Title IX process initiated on fabricated grounds; and publicly accused of drug distribution, threats of violence, and, finally, sexual assault. The institutional channels nominally available to Winter — the RA system, the LGBT Resource Center, CAPS, and the Title IX office — had been weaponized against Winter or had remained silent.

162. Plaintiff Sofia Akber has suffered the loss of her child. The Estate and Winter's distributees have suffered grievous and continuing damages, including the pecuniary losses attendant to Winter's death; Winter's pre-death pain, suffering, emotional distress, and reputational injury; and medical and funeral expenses.

## V. CAUSES OF ACTION

### COUNT I

### Violation of Title IX of the Education Amendments of 1972

***(20 U.S.C. § 1681 et seq. — By the Estate Against Defendant Cornell University)***

163. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein. This claim is asserted by the Estate as a claim of the decedent that survives pursuant to N.Y. EPTL § 11-3.2.

164. At all relevant times, Cornell was and is a recipient of federal financial assistance and operates education programs and activities within the meaning of Title IX. Cornell is therefore prohibited from subjecting any person to discrimination on the basis of sex in its education programs and activities, and is subject to suit for damages for such discrimination.

165. Discrimination "on the basis of sex" under Title IX includes discrimination because of a person's sex, sexual orientation, and gender identity. Winter was non-binary, used they/them pronouns, and identified as a member of the LGBTQ+ community.

166. Winter was subjected to harassment based on sex. The culminating act of the campaign against Winter was, on its face, harassment based on sex. The broader campaign was additionally directed at Winter because of Winter's non-binary gender identity and LGBTQ+ status: it was conducted within, and weaponized Winter's membership in, a gender-identity-defined residential community that Cornell created and curated, and it deployed sexualized and predatory characterizations historically directed at LGBTQ+ persons. The harassment would not have occurred but for Winter's sex, gender identity, and sexual orientation.

167. The harassment was severe, pervasive, and objectively offensive. Over an eight-week period, from September 14 to November 10, 2024, Winter was subjected to at least six escalating episodes of harassment and bullying by fellow Cornell students. The harassment was continuous rather than isolated, was carried out across multiple communications platforms and physical spaces controlled by Cornell, and was of a character that a reasonable person in Winter's position would find, and that Winter did find, profoundly degrading and offensive.

168. The harassment was so severe, pervasive, and objectively offensive that it deprived Winter of equal access to the educational opportunities and benefits Cornell provided. Winter was banished from the LGBTQ+ community programming Cornell curated; Winter became unable and unwilling to enter the Loving House residence to which Winter held paid membership privileges; Winter's standing and continued participation in the KDR fraternity were placed under direct attack; and Winter was ultimately deprived, through death, of all access to every educational opportunity Cornell offered.

169. One or more appropriate persons at Cornell had actual knowledge of the harassment. Such persons included the Residence Hall Director responsible for Mews Hall, a full-time professional staff member with supervisory and disciplinary-escalation authority; the Associate Dean of Students who directs Cornell's LGBT Resource Center and served as a Community Fellow embedded in Loving House programming; and the Cornell officials with authority over student conduct and Title IX who were placed on direct, formal notice when Defendant Green initiated or attempted to initiate a student-conduct or Title IX process, and sought a no-contact order, against Winter. Cornell's Resident Advisor had direct, contemporaneous knowledge of the escalating conflict inside Loving House no later than September 16, 2024, and was obligated to escalate that knowledge under Cornell's own residential-life protocols.

170. Cornell was deliberately indifferent to the known harassment of Winter. Cornell's response was no response at all: Cornell conducted no investigation, undertook no remediation, made no protective contact with Winter, and enforced none of its anti-harassment policies, including its Policy 6.4, with respect to the campaign against Winter. Cornell's inaction was clearly unreasonable in light of the known circumstances and amounted to an official decision not to remedy the harassment. Cornell's indifference toward Winter was not the product of institutional

incapacity: during the same period, Cornell's apparatus repeatedly responded to Defendant Jennings through welfare checks, faculty outreach, crisis counseling, clinical referrals, academic extensions, and academic-concern correspondence. Cornell possessed the personnel, the information, and the authority to act for Winter, and chose not to.

171. Cornell's deliberate indifference caused Winter to undergo further harassment and made Winter vulnerable to harassment that in fact occurred. After Cornell acquired knowledge of the conflict in mid-September 2024, the harassment escalated, uninterrupted, through Winter's banishment, the door-to-door campaign, the fraternity campaign, and the fabricated sexual-assault accusation. A reasonable, non-indifferent response by Cornell at any point would have interrupted the escalation and prevented the harm that followed.

172. The harassment occurred in contexts over which Cornell exercised substantial control, including inside Cornell's own residence halls; within a residential community that Cornell convened, curated, staffed, and supervised; through Cornell's own student-conduct and Title IX machinery; and among students over whom Cornell possessed full disciplinary authority.

173. In the alternative and in addition, Cornell's official policy and practice of convening, marketing, and operating a gender-identity-defined residential community and its associated communications ecosystem — with actual knowledge of the population's elevated vulnerability, and with no monitoring, no specialized training, and no oversight — created a heightened risk of sex-based harassment within a program and activity over which Cornell exercised substantial control. That risk materialized in the harassment and death of Winter.

174. As a direct and proximate result of Cornell's violation of Title IX, Winter suffered the injuries alleged herein, including pre-death injury and death, and the Estate and distributees

have suffered damages. Plaintiff is entitled to compensatory damages, attorneys' fees and costs, and such further relief as is just.

**COUNT II**

**Violation of the Fair Housing Act**

***(42 U.S.C. §§ 3604(b), 3617 — By the Estate Against Cornell)***

175. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein. This claim is asserted by the Estate as a claim of the decedent that survives pursuant to N.Y. EPTL § 11-3.2.

176. Cornell's residence halls, including Mews Hall and Loving House, are dwellings within the meaning of the Fair Housing Act, and Cornell is their owner, operator, and lessor. Winter was a tenant of Cornell's dwellings as a resident of Loving House during the 2023–2024 academic year and as a resident of Cornell-owned or Cornell-operated student housing during the 2024–2025 academic year. In addition, Winter's paid out-of-house membership in Loving House, for which Winter tendered dues in the fall 2024 semester, conferred continuing privileges of access to and enjoyment of the Loving House dwelling community — privileges in connection with the rental of a dwelling.

177. Discrimination "because of sex" under the Fair Housing Act includes discrimination because of gender identity and sexual orientation. Winter was non-binary and identified as LGBTQ+.

178. Cornell subjected Winter to a hostile housing environment in violation of 42 U.S.C. § 3604(b). Winter was subjected to unwelcome harassment because of sex that was sufficiently severe or pervasive as to interfere with Winter's use and enjoyment of the dwelling and to alter the terms, conditions, and privileges of Winter's tenancy and membership — including, without

limitation, the door-to-door campaign conducted inside the dwelling, the orchestrated banishment of Winter from the dwelling community's principal communications channel, and the sustained campaign that rendered Winter unwilling to enter the Loving House building.

179. Cornell knew or should have known of the tenant-on-tenant harassment of Winter and failed to take prompt action to correct it, notwithstanding that Cornell possessed the power to do so. Unlike an arms-length landlord, Cornell exercised pervasive and substantial control over both the harassing tenants and the dwelling environment: Cornell stationed nine Resident Advisors and a full-time professional Residence Hall Director inside the building; embedded a Faculty-in-Residence and a Dean-level Community Fellow in the community; subjected all resident conduct to its Community Living Standards, Student Code of Conduct, and Policy 6.4; and held the authority to discipline, relocate, or remove the harassing residents. Cornell's failure to exercise that control in the face of actual knowledge constituted intentional discrimination.

180. Defendants Jennings and Green, and Defendant Cornell, coerced, intimidated, threatened, and interfered with Winter in the exercise and enjoyment of rights granted and protected by § 3604, on account of sex, in violation of 42 U.S.C. § 3617. Winter was exercising the right to obtain, use, and enjoy a dwelling. Defendants Jennings and Green interfered with that right through the door-to-door campaign inside the dwelling, the engineering of Winter's banishment from the dwelling community, and the campaign of accusation that drove Winter from the building; Cornell interfered through its deliberate refusal to act while wielding control over the dwelling and its residents. Each Defendant acted intentionally or with reckless disregard for Winter's protected rights, and each acted because of Winter's sex.

181. Defendants' conduct constituted a continuing violation of the Fair Housing Act that did not terminate until at least November 10, 2024. This action is brought within two years of the termination of the discriminatory housing practice.

182. As a direct and proximate result of Defendants' violations of the Fair Housing Act, Winter suffered humiliation, emotional distress, deprivation of the use and enjoyment of housing, and the further injuries alleged herein, culminating in Winter's death. The Estate is entitled to recover actual damages, including damages for emotional distress, together with punitive damages, attorneys' fees, and costs.

## COUNT III

**Negligence — Voluntary Undertaking and Proprietary Duty**

***(By the Estate Against Defendant Cornell University)***

183. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

184. Cornell voluntarily undertook a duty of care to the residents and members of the Loving House community, a defined and identifiable class that included Winter. Cornell affirmatively represented, in its published marketing and recruitment materials, in its internal publications, and through programming and staffing it implemented, that Loving House would "protect[]" and "support[]" its LGBTQ+ residents and members and provide an environment of "safety." Cornell operationalized that undertaking by dedicating residential staff to the community, embedding senior administrators and CAPS programming into it, and requiring each resident, including Winter, to acknowledge and adopt the Loving House mission as a condition of residency. Having so undertaken, Cornell was obligated to perform with reasonable care.

185. Winter and Winter's family reviewed Cornell's representations regarding Loving House and relied upon them in deciding that Winter would live there; Winter applied to, was placed in, and remained connected to the Loving House community in justifiable reliance on Cornell's represented commitment to protect and support that community. Cornell's undertaking, and its failure to perform that undertaking with reasonable care, increased the risk of harm to Winter and induced Winter's reliance to Winter's detriment.

186. Independently, in its capacity as owner and landlord of Mews Hall and its residential communities, Cornell owed Winter the duty to take minimal precautions to protect against reasonably foreseeable harm occurring on its premises, including the reasonably foreseeable harmful conduct of third persons.

187. Independently, Cornell owed Winter a duty to take appropriate responsive action once it received credible reports of ongoing harassment, bullying, and false accusations directed at Winter, carried out inside Cornell's residence halls, within the community Cornell convened and staffed, and through Cornell's own student-conduct processes, by students within Cornell's disciplinary control. Cornell's relationship with its students is far more than that of a landlord and tenant: Cornell establishes student-conduct policies, including Policy 6.4, and has the authority to investigate, separate, relocate, and discipline students. Cornell received such reports through the channels alleged herein.

188. The harm to Winter was foreseeable. Cornell knew or should have known that the population it concentrated in Loving House faced sharply elevated rates of serious psychiatric illness, self-injury, and suicide — knowledge reflected in the published medical literature, including research published by Cornell's own Bronfenbrenner Center for Translational Research, and confirmed by Cornell's own institutional experience with a documented student-suicide cluster

in the past. Cornell further had actual knowledge, as the events unfolded, of Defendant Jennings's escalating psychiatric crisis, of the conflict inside Loving House, and of the campaign against Winter.

189. Cornell breached its duty of reasonable care by, among other things: staffing Loving House with generically trained Resident Advisors despite its knowledge of the community's elevated risk profile; embedding no appropriate supervision in the community; imposing no monitoring, oversight, or accountability on the Server, the community's principal communications channel; failing to investigate or remediate the escalating campaign against Winter despite actual knowledge of it; and failing to relieve Winter of the crisis-caregiving role that Cornell's own professional staff should have performed for Defendant Jennings.

190. Cornell's breaches were a substantial factor in bringing about Winter's injuries and death. Winter's death by suicide was a foreseeable consequence of Cornell's negligence and does not constitute a superseding cause: Cornell's conduct foreseeably caused and aggravated the emotional disturbance that led to Winter's death, and there is a significant causal connection between Cornell's negligence and that death.

191. As a direct and proximate result of Cornell's negligence, Winter suffered the pre-death injuries alleged herein and died, and the Estate and distributees have been damaged in an amount to be proven at trial.

**COUNT IV**

**<u>Negligent Supervision, Training, and Retention</u>**

***(By the Estate Against Defendant Cornell University)***

192. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

193. At all relevant times, Cornell employed the Resident Advisor(s) assigned to Loving House and Mews Hall during the 2023–2024 and 2024–2025 academic years; the Residence Hall Director responsible for Mews Hall; the LGBT Resource Center Community Fellow(s) embedded in Loving House programming; and the CAPS clinician(s) responsible for Loving House programming. Each acted within the scope of duties Cornell assigned in connection with the protective undertaking Cornell had assumed.

194. Cornell knew or, in the exercise of reasonable care, should have known that, absent adequate training and supervision, these employees would be unable to identify, escalate, or respond to the mental-health crises and peer harassment foreseeably arising in a residential community that Cornell knew presented an elevated psychiatric-acuity risk. Cornell's knowledge was confirmed in real time: when its Resident Advisor received an actual report of the escalating conflict on or about September 16, 2024, the response, in the reporting student's contemporaneous words, was that the "RA isn't even doing anything," and, upon information and belief, no escalation, documentation, or follow-up occurred.

195. Cornell breached its duty to train, supervise, and retain these employees with reasonable care. Cornell did not train its Loving House Resident Advisor(s) to identify, escalate, or respond to mental-health crises or peer harassment in a population it knew to present elevated risk; it did not require its Residence Hall Director to monitor or report on the Loving-House-specific risk environment; and it did not require its embedded Community Fellow(s) or any employee to exercise any oversight of the community's principal communications channel.

196. The harm to Winter arose directly from the supervisory failures alleged: the harassment of Winter was conducted inside Cornell's residence and through the community Cornell convened and staffed, in circumstances Cornell's employees were assigned but untrained

and unsupervised to address. As a direct and proximate result of Cornell's negligent supervision, training, and retention, the campaign against Winter proceeded for eight weeks without intervention by any Cornell employee with authority to stop it, and was a substantial factor in bringing about Winter's injuries and death.

197. As a direct and proximate result, the Estate and distributees have been damaged in an amount to be proven at trial.

**COUNT V**

**Breach of Actual or Implied Contract**

***(By the Estate Against Defendant Cornell University)***

198. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

199. Upon Winter's enrollment and acceptance of Cornell's offer of admission and housing, an implied contract was formed between Winter and Cornell, the terms of which were supplied by Cornell's bulletins, circulars, publications, housing agreements, and program-house materials made available to Winter.

200. The contract included specific, identifiable promises by Cornell relating to Loving House, and not mere general assurances: Cornell's published representation that Loving House exists to "protect[] and support[]" its LGBTQIA+ community within "an environment of close-knit support and safety"; Cornell's published representation that the Mews Hall community is "supported by a staff who is trained" to provide "ongoing support"; the program-house acknowledgment that Cornell required Winter to execute, adopting the Loving House "mission and purpose" as the basis of residency; Winter's housing agreement(s) with Cornell; and Winter's

paid out-of-house membership, for which Winter tendered dues in the fall 2024 semester in exchange for continuing membership, access, and the represented benefits of the community.

201. Winter performed all obligations under the contract, including the payment of tuition, housing charges, and out-of-house membership dues; the execution of the required program-house acknowledgment; and adherence to the community's expectations.

202. Cornell materially breached the contract by failing to provide the specifically promised protective and supervised community: Cornell provided no staffing or training commensurate with its representations, no oversight of the community's communications, and no enforcement of its own protective and anti-harassment commitments when the community it had promised to make safe turned against one of its dues-paying members in a sustained and visible campaign of harassment.

203. As a direct and proximate result of Cornell's breaches, Winter suffered the injuries alleged herein, and the Estate has been damaged in an amount to be proven at trial, including restitution of amounts paid and consequential damages.

**COUNT VI**

**Wrongful Death**

***(N.Y. EPTL § 5-4.1 — By Plaintiff, as Administrator, on Behalf of Winter's Distributees, Against All Defendants)***

204. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

205. Plaintiff is the duly appointed Administrator of the Estate and brings this claim for the exclusive benefit of Winter's distributees pursuant to N.Y. EPTL § 5-4.4. Winter is survived by distributees, including Plaintiff, who have sustained pecuniary loss as a result of Winter's death.

206. Winter died on November 10, 2024 as a result of the wrongful acts, neglects, and defaults of the Defendants alleged herein. Each predicate wrong set forth below was actionable by Winter, and Winter could have maintained an action and recovered damages upon it, at the moment of Winter's death.

207. Cornell's violations of Title IX, the Fair Housing Act, and N.Y. Executive Law § 296(4), its negligence and negligent performance of its voluntary undertaking, its negligent supervision, training, and retention, and its breach of contract, each as alleged above, were wrongful acts, neglects, or defaults that caused Winter's death.

208. Between September 14 and November 10, 2024, Defendant Jennings published to third parties — including the Server's membership of more than one hundred Cornell students, Defendant Green, and others — false statements of fact concerning Winter, including without limitation: that Winter had perpetrated emotional abuse upon her; that Winter's conduct constituted targeted harassment of her; that Winter told her she would not succeed at Cornell; that a "mystery" ADHD pill Winter "gave" her caused her hospitalization; that Winter had threatened physical violence against her and Green; and that Winter had sexually assaulted her. Each statement was a statement of fact and not opinion; each was false; each was published to persons other than Winter without privilege or authorization; and each was made with knowledge of its falsity or with reckless disregard for its truth, as established by, among other things, the contradiction between Jennings's public accounts and her contemporaneous private communications and her post-death written admissions. Each statement charged Winter with a serious crime or tended to injure Winter in Winter's standing and occupation as a student and prospective fraternity member, and was therefore defamatory per se, entitling Winter to presumed and actual damages without proof of special harm.

209. Defendant Jennings's sustained, multi-channel, two-month campaign of escalating false accusations against Winter — directed at a person whose vulnerability, caregiving loyalty, and dependence on the Loving House community Jennings knew intimately, and culminating in a fabricated sexual-assault accusation pressed upon Winter with the representation that the entire community would credit it — was extreme and outrageous conduct, beyond all possible bounds of decency and utterly intolerable in a civilized community. Jennings engaged in that conduct with the intent to cause Winter severe emotional distress, or in deliberate disregard of a high probability that severe emotional distress would result; the conduct in fact caused Winter severe emotional distress.

210. On or about October 24, 2024, Defendant Green published, door-to-door inside Loving House, false statements of fact that Winter was "drugging people" and had threatened violence; in late October 2024, Green published to members of the KDR fraternity that Winter was a physical threat, relying on screenshots Green knew or should have known were fabricated or misattributed; and Green published to Cornell, through a student-conduct or Title IX process and an application for a no-contact order, that Winter had engaged in threatening and assaultive conduct. Each statement was a false statement of fact, published without privilege — any qualified privilege being defeated by Green's malice and the excessive scope of publication — and each charged Winter with a serious crime, and was therefore defamatory per se.

211. Defendant Green's door-to-door campaign within Winter's residential community, his engineering of Winter's banishment from the community's principal communications channel through the disclosure of Winter's confidential self-harm history, his campaign to destroy Winter's standing in the KDR fraternity, and his weaponization of Cornell's conduct processes against Winter on fabricated grounds together constituted extreme and outrageous conduct, undertaken

with intent to cause, or in reckless disregard of a high probability of causing, severe emotional distress, and in fact caused Winter severe emotional distress.

212. Winter's death by suicide was the foreseeable consequence of each Defendant's wrongful conduct — conduct whose design and effect was the destruction of Winter's reputation, community, and psychological integrity — and there is a significant causal connection between that conduct and Winter's death, as confirmed by Winter's suicide note and by Defendant Jennings's own written admission, published within hours of the death, that Winter "killed themselves because of me." Winter's suicide therefore does not constitute a superseding cause that relieves any Defendant of liability.

213. Each Defendant's wrongful conduct was a substantial contributing cause of Winter's death. As a direct and proximate result, Winter's distributees have suffered pecuniary loss, including loss of support, services, and prospective inheritance, and the Estate has incurred medical, funeral, and burial expenses. Plaintiff is entitled to all damages available under N.Y. EPTL § 5-4.3, to punitive damages against Defendants Jennings and Green for their intentional and malicious conduct and against Cornell to the extent of its reckless and wanton indifference, and to interest from the date of death.

**COUNT VII**

**<u>Survival Action</u>**

***(N.Y. EPTL § 11-3.2 — By the Estate Against Defendant Cornell University)***

214. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

215. The causes of action that accrued to Winter before death — including Winter's claims against Cornell under Title IX, the Fair Housing Act, and N.Y. Executive Law § 296(4),

and Winter's negligence-based claims against Cornell — survive to the Estate pursuant to N.Y. EPTL § 11-3.2.

216. Between September 14 and November 10, 2024, as a direct and proximate result of Cornell's wrongful conduct alleged herein, Winter consciously experienced and endured severe and continuing emotional distress, humiliation, reputational injury, social isolation, and mental anguish, including conscious pain and suffering in the hours preceding death. This injury is the decedent's own, separate and distinct from the pecuniary losses of the distributees.

217. The Estate is entitled to recover all damages Winter could have recovered for that conscious pain, suffering, and emotional distress had death not ensued, in an amount to be proven at trial.

**COUNT VIII**

**Violation of the New York State Human Rights Law: Educational Institutions**

***(N.Y. Executive Law §§ 296(4), 297(9) — By the Estate Against Defendant Cornell University)***

218. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein. This claim is asserted by the Estate as a claim of the decedent that survives pursuant to N.Y. EPTL § 11-3.2.

219. Cornell is an "educational institution" within the meaning of N.Y. Executive Law § 292(40)(a): it is an educational corporation that holds itself out to the public to be non-sectarian and is exempt from taxation pursuant to Article Four of the Real Property Tax Law.

220. N.Y. Executive Law § 296(4) makes it an unlawful discriminatory practice for an educational institution to permit the harassment of any student by reason of, among other things, the student's sex, sexual orientation, or gender identity or expression.

221. Winter was a Cornell student. Fellow Cornell students harassed Winter by reason of Winter's sex, sexual orientation, and gender identity or expression, as alleged in paragraphs 165 through 167 and throughout this Complaint.

222. Cornell permitted that harassment. Through the officials and channels, Cornell knew of the harassment no later than mid-September 2024 and, as it escalated, possessed the authority to stop it, and took no action to investigate, remedy, or prevent it.

223. The provisions of the Human Rights Law are to be construed liberally for the accomplishment of its remedial purposes, regardless of whether federal civil rights laws with comparably worded provisions have been so construed. N.Y. Executive Law § 300.

224. As a direct and proximate result of Cornell's unlawful discriminatory practice, Winter suffered severe emotional distress, humiliation, mental anguish, and the other injuries alleged herein before death. The Estate is entitled to compensatory damages, including damages for Winter's emotional distress, and to reasonable attorneys' fees and costs pursuant to N.Y. Executive Law § 297(10).

225. No complaint concerning the practices alleged herein has been filed with the New York State Division of Human Rights or any local commission on human rights.

**COUNT IX**

**<u>Violation of the New York State Human Rights Law: Educational Institutions</u>**

***(N.Y. Executive Law §§ 296(4), 297(9) — By Plaintiff Sofia Akber, Individually, Against Defendant Cornell University)***

226. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

227. Plaintiff Sofia Akber is Winter's mother. N.Y. Executive Law § 297(9) provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages."

228. Plaintiff is a person aggrieved by Cornell's unlawful discriminatory practice of permitting the harassment of her child by reason of Winter's sex, sexual orientation, and gender identity or expression, as alleged in Count VIII.

229. As a direct and proximate result of that practice, Plaintiff has suffered severe emotional distress and mental anguish. Plaintiff is entitled to compensatory damages, punitive damages, and to reasonable attorneys' fees and costs pursuant to N.Y. Executive Law § 297(10).

**WHEREFORE**, Plaintiff Sofia Akber, individually and as Administrator of the Estate of Fionn Ivar "Winter" Knutson, deceased, respectfully demands judgment against Defendants, jointly and severally, together with an award of compensatory damages in an amount to be determined at trial; consequential damages; damages for the decedent's conscious pain, suffering, and emotional distress prior to death; damages for the pecuniary losses sustained by the decedent's distributees; damages to Plaintiff individually for her emotional distress and mental anguish; damages for emotional distress, humiliation, and the loss of use and enjoyment of housing; restitutionary damages; punitive and exemplary damages; pre-judgment and post-judgment interest at the maximum rate permitted by law, including interest from the date of death; reasonable attorneys' fees, costs, and expenses of suit, including under N.Y. Executive Law § 297(10); such declaratory and injunctive relief as may be appropriate; and such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, NY
October 26, 2026

Yassi Law PC

*Reza Yassi*

______________________________

Reza Yassi, Esq.
Yassi Law PC
Attorneys for:
Plaintiff
333 Park Avenue South, Suite 3A
New York, NY 10010
ry@yassilaw.com
646-992-2138